[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-14920

_____

D. C. Docket No. 04-61143-CV-FAM

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 7, 2007
THOMAS K. KAHN
CLERK

AMERICAN UNITED LIFE INSURANCE CO.,
AMERUS LIFE INSURANCE COMPANY, ET AL.,

Plaintiffs-Appellants,

versus

ROBERTO MARTINEZ, Court-Appointed Receiver
MUTUAL BENEFITS CORPORATION, ET AL.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 7, 2007)**

Before PRYOR and FAY, Circuit Judges, and STEELE,* District Judge.

FAY, Circuit Judge:

_____

    * Honorable William H. Steele, United States District Judge for the Southern District of Alabama, sitting by designation.

The appellants, seventeen insurers that filed an ancillary tort suit in a Securities and Exchange Commission ("SEC") action against a group of viatical settlement companies, challenge the dismissal of their amended complaint. A viatical contract is an agreement to purchase life insurance benefits from a viator, a policyholder who is terminally ill or of advanced age. The original policyholder sells the rights to his policy for a fraction of what the policy would pay upon his death, realizing an immediate return on an otherwise illiquid asset. The insurers alleged that the appellees, three viatical settlement companies and their court-appointed receiver, knowingly purchased and / or serviced life insurance policies from a number of individuals who submitted fraudulent insurance applications. Although the viatical settlement companies ("receivership entities") had acquired the rights to 1700 of the insurers' policies before they entered receivership, the insurers' complaint focused on just five policies. The insurers asserted twenty-five claims, ranging from common law conspiracy, aiding and abetting fraud, violations of the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, and violations of the Florida Viatical Settlement Act ("FVSA") and of a Pennsylvania insurance fraud statute. The receiver moved to dismiss all of the claims except one, which alleged a violation of Pennsylvania insurance law. The district court granted the motion, but dismissed the complaint in its entirety, giving

the insurers leave to file a Second Amended Ancillary Complaint by a certain deadline. The insurers allowed the deadline to pass without amending the complaint further, and filed this appeal. For the reasons stated below, we affirm the dismissal of the entire amended complaint, including the *sua sponte* dismissal of the claim concerning Pennsylvania insurance law.

## BACKGROUND

The district court dismissed the insurers' complaint for being short on the facts, namely, those required to plead fraud under Rule 9(b) of the Federal Rules of Civil Procedure, but we preface this discussion by noting several important facts. The insurers' complaint hinges on a series of statements that four HIV-positive individuals made when they applied for life insurance in the mid 1980's-early 1990's. The individuals all made the same allegedly fraudulent statement on their insurance applications; they said that they had never been diagnosed or treated for AIDS or any other blood or immune system disorder. The insurers do not allege that these particular individuals—Wendell Mullins, Jack Johnson, Gerald Metoyer, and William Buchner—share any association with each other, apart from the fact they ultimately sold their policies to the receivership entities. The insurers have not named these individuals or their estates as additional

3

defendants in this suit. Nor have they joined the investors who ultimately purchased interests in these separate viaticals as parties.

Significantly, none of these individuals resided in Florida, a fact that bars the insurers' claims under the FVSA, which only regulates viatical transactions with in-state viators.[1] Moreover, each of these individuals obtained their insurance policies from different companies at various times over a ten-year period and, in at least two cases, well before the receivership entities came into existence.[2] One fact that links these separate policies, however, is that they all contain "incontestability" clauses. These clauses grant the insurers a two-year window of

---

[1]The FVSA provides a cause of action against any person who knowingly enters into a viatical settlement for a policy that was obtained through material misrepresentations or omissions. Fla. Stat. § 626.99275(1)(a). However, the Act also contains a conflict of law provision that applies to settlements transacted with out-of-state viators. Section 626.99245(2) the Act provides that: "A viatical settlement provider who from this state enters into a viatical settlement contract with a viator who is a resident of another state that has enacted statutes or adopted regulations governing viatical settlement contracts shall be governed in the effectuation of that viatical settlement contract by the statutes and regulations of the viator's state of residence. If the state in which the viator is a resident has not enacted statutes or regulations governing viatical settlement agreements, the provider shall give the viator notice that neither Florida nor his or her state regulates the transaction upon which he or she is entering." Fla. Stat. § 626.99245(2).

[2]Mutual Benefits Corporation ("MBC") was incorporated under the laws of the State of Florida in 1994. MBC established Viatical Services, Inc. ("VSI"), an affiliated corporation, to service its viatical accounts in1996. VSI is likewise, incorporated under the laws of the State of Florida and operates out of the same offices as MBC. MBC owns Viatical Benefactors, LLC ("VBLLC"), a Delaware corporation, which it established in 1996 to transact business in states such as California and Texas, where MBC is not licensed to sell viaticals. William Buchner obtained his policy in 1986 and Jack Johnson obtained his policy in 1988, at least six years before MBC came into existence.

4

opportunity in which to contest a policy. Thereafter, the incontestability clauses prohibit insurers from cancelling or voiding the policy for any reason other than non-payment of premiums.

Accordingly, we note at the outset that the FVSA does not govern the viaticals at issue here. They are regulated, if at all, by statutes in the states where the viators reside(d). We also note that incontestability clauses may apply here to bar the insurers' from pursuing their fraud-based claims (request for declaratory judgment, aiding and abetting fraud, conspiracy to commit fraud, and even RICO claims). Given the amount of time that elapsed between issuance of the policies and their conversion into viaticals, which amounts to at least six years in two instances, statutes of limitations may also apply to bar the insurers from pursuing common law fraud and conspiracy claims. Statutes of limitations may also apply to bar the insurers' statutory claims under the Pennsylvania law, and may provide alternative grounds for dismissing the insurers' FVSA claims.

Additionally, only four of the seventeen insurers who joined as plaintiffs in the ancillary action against the receivership entities allege that the receiver played a part in underwriting the challenged policies: Valley Forge Life Insurance Company ("VFL"), Reassure American Life Insurance Company ("Reassure"), American United Life Insurance Company ("AUL"), and Jefferson Pilot Financial

Insurance Company ("Jefferson Pilot"). The remaining insurers have not asserted particularized claims against the receivership entities or the receiver.

The impetus behind this complaint occurred on May 3, 2004 when the SEC requested a temporary restraining order ("TRO") against Mutual Benefits Corporation ("MBC"), Viatical Benefits, LLC ("VBLLC") and Viatical Services, Inc. ("VSI"). The SEC asked the court to appoint a receiver to administer the companies' assets while it pursued enforcement proceedings against them for violating federal securities laws. The court issued a TRO on May 4, 2004 which prohibited the three companies from engaging in new business and appointed a receiver, Roberto Martínez, Esquire, to oversee their existing viatical accounts, which included at least 1700 of the insurers' policies.

The SEC alleged that the receivership entities had defrauded investors by misrepresenting the amount of escrow that would be needed to cover future premium payments on the policies, by using erroneous life expectancy profiles in solicitations to investors, and by paying premiums on some policies out of the escrow accounts of others. By this point, MBC, which began purchasing viaticals in 1994, owned interests in over 9,000 separate life insurance policies, and could claim assets, in the form of future death benefits, totalling $1.067 billion.

As news of the SEC action broke, the insurers realized that a large number of their policies might have ended up in the portfolio of viaticals under receivership. The insurers filed an Ancillary Complaint in the SEC action on August 31, 2004, asserting that a substantial proportion of their policies, perhaps as much as 40%, had been procured through fraud. They based this estimate on a finding in a 2000 Florida grand jury report that noted 40%-50% of the viaticals brokered by Florida companies had been procured through fraud.

The insurers asserted seven causes of action, five of which were predicated on allegations of fraud. In their first cause of action, the insurers asked the court for a declaratory judgment that any of the insurers' policies which had been procured through fraud and which were subsequently acquired by the receivership entities were void *ab initio*. In their second and third causes of action, the insurers asked the court to declare that the receiver be estopped from using incontestability clauses to enforce any fraudulently procured policies. In their fourth and fifth causes of action, the insurers requested indemnification from MBC for any death benefits paid on fraudulently procured policies, and for any future payment obligations. In their sixth cause of action, the insurers alleged damages under the FVSA, Fla. Stat. § 626.991 et seq., which prohibits anyone from entering into a viatical settlement if they know that the policy it addresses was procured through

7

fraud. In their final cause of action, the insurers requested a modification of the receivership order to preclude the receiver from taking any action that would prejudice their rights.

Although the insurers estimated that as many as 40% of their policies may have been procured through fraud, they provided particulars on only three policies for which they had received death claims.[3] They alleged that two of the policies were fraudulently procured by a single individual, Wendell Mullins, but failed to plead that the receivership entities helped Mullins submit a fraudulent application for insurance. The other policy that the insurers identified in their ancillary complaint, a policy for Thomas Durkan, did not suffer from fraudulent procurement. Rather, the insurers alleged that a Colombian sales agent of MBC purchased the policy for money-laundering purposes, and that federal agents had seized all of the proceeds traceable to the viatical. Although the insurers allege that they received a death claim for the original policyholder, they did not claim to have paid a death benefit on the policy.

---

[3]The insurers also identified one policy that they believed had all the indicia of a fraudulently procured policy, but noted that the policyholder, John Doe, was still alive. As a result, the insurers acknowledged that they had not paid out any death benefits on the policy. In this instance as well, however, the insurers failed to plead that the receivership entities assisted the policyholder to submit a fraudulent application.

On December 24, 2004, the receiver moved to dismiss the insurers' complaint for failure to allege fraud with specificity, for failure to state a claim, and for failure to join necessary parties (the owners and beneficiaries of the challenged viaticals) pursuant to Rules 9(b), 12(b)(6), and 12(b)(7) of the Federal Rules of Civil Procedure, respectively. After oral argument on the motion, the district court dismissed the insurers' complaint without prejudice on January 31, 2005, granting them leave to amend their complaint.

When the insurers filed their original ancillary complaint they did not know how many of their policies might lie within the scope of assets in receivership. In the interim, however, the receiver supplied the insurers with a list of all the policies within his control. The insurers determined that they had issued at least 1700 of those policies. Confident that they could review those policies for evidence of fraud in fairly short order, the insurers asked the court for just thirty days to file an amended complaint. The court granted the insurers until March 15, 2005 to file an amended complaint, but cautioned them that they would have to plead fraud for each policy in specific terms.

On March 15, 2005, the insurers filed an Amended Ancillary Complaint. Although the amended complaint alleged twenty-five separate causes of action, the insurers continued to focus on only a handful of policies. The policies

9

pertained to Wendell Mullins and Jack Johnson, two individuals who had succumbed to AIDS, and to William Buchner and Gerald Metoyer, two individuals who were still suffering with AIDS.[4] The insurers alleged twenty-one counts of fraud, conspiracy, and civil racketeering claims in connection with these policies. However, only four of the seventeen insurers—VFL, Reassure, AUL and Jefferson Pilot—asserted damages in connection with these policies. Ten of the remaining insurers alleged two separate counts of racketeering, and all seventeen insurers joined in a request for equitable relief, asking the court to modify its receivership order and to order an accounting.

The counts that addressed specific viaticals—those relating to the Mullins, Johnson, Buchner and Metoyer policies—clustered around the same series of claims. The insurers asserted that: 1) the receivership entities violated Florida law by entering into viatical settlements for fraudulently procured policies; 2) the receivership entities aided and abetted the original policyholders to commit common law fraud; 3) the receivership entities conspired to acquire and/or submit claims on fraudulently procured policies; 4) the receivership entities engaged in a pattern of racketeering and used the United States mail to further their fraudulent

---

[4]The insurers dropped two of the policies that they challenged in their original ancillary complaint - the policies pertaining to Durkan and Doe—and added three new policies—the Metoyer, Buchner, and Johnson policies.

enterprise; and 5) the policies that the receivership entities acquired in this manner were void *ab initio*.[5]

More specifically, insurers VFL, Reassure, Jefferson Pilot and AUL asserted that MBC violated the FVSA, Fla. Stat. § 626.99275(1)(a), when it entered into viatical settlement agreements with policyholders Mullins, Johnson, Metoyer and Buchner (counts I, VI, X, and XVI).[6] Section 626.99275(1)(a) of the FVSA makes it unlawful for any person to "enter into, broker, or otherwise deal in a viatical settlement contract" for a life insurance policy, knowing that the policy was procured through fraud. According to the insurers' amended complaint, MBC knew that these individuals lied about their medical histories when they applied

---

[5]Count II represents an exception. Here, insurer VFL, which is headquartered in Pennsylvania, alleged that the receivership entities violated a Pennsylvania law, 18 Pa. Cons. Stat. § 4117, with respect to the Wendell Mullins policies. According to VFL, the receivership entities knowingly submitted false and misleading information on the Mullins policies, and aided and abetted Mullins to make false statements as part of his applications, thereby violating 18 Pa. Cons. Stat. § 4117. None of the other insurers allege violations of this statute. VFL did not identify specific section(s) of the Pennsylvania insurance fraud statute in its pleading; however, § 4117(a)(2) & (3) appear to apply. Section 4117(a)(2) states that a person commits an offense if he "[k]nowingly and with the intent to defraud any insurer" presents any statement that forms a part of a claim or in support of a claim that contains "any false, incomplete or misleading information concerning any fact or thing material to the claim." Section 4117(a)(3) makes it unlawful for a person to "[k]nowingly and with the intent to defraud any insurer" assist, aid, abet, or conspire "to prepare or make any statement" that is intended to be submitted to an insurer to support a claim that contains "any false, incomplete or misleading information concerning any fact or thing material to the claim."

[6]Count X alleges that the "receivership entities," not MBC, purchased the Metoyer policy in violation of the FVSA. The entity that took control of the California resident's policy was VBLLC, since MBC was not licensed to operate in California.

11

for insurance because MBC reviewed their original applications as part of the viatical settlement process and had doctors examine the individuals to determine their life expectancies.

In two instances (the policies pertaining to Mullins and Johnson), the insurers had already paid out death benefits on the viators. As a result, the insurers asserted that they were entitled to damages under section 626.9927(3) of the FVSA, which provides that any person damaged by a violation of the Act may seek damages, court costs, and attorney's fees. They also asserted damages for the costs that they incurred in managing all five of these policies, in paying broker commissions, and in investigating the extent of the fraud.

VFL, Reassure, Jefferson Pilot and AUL also asserted four counts of fraud against the receivership entities (counts IV, VIII, XII, and XVIII). They argued that the receivership entities aided and abetted the original policyholders—Mullins, Johnson, Metoyer and Buchner—to procure insurance through fraudulent means. According to the insurers, these policyholders did not realize a benefit from the policies until MBC offered to purchase them as viaticals. Thus, the insurers asserted, MBC aided and abetted the original policyholders to realize the intended goal of their fraud: a payout on the policy.

Insurers VFL, Reassure, Jefferson Pilot and AUL alleged further that the receivership entities not only aided and abetted Mullins, Johnson, Metoyer, and Buchner in committing insurance fraud, but they also engaged in an "Acquisition Conspiracy." According to counts III, VII, XI, and XVII of the amended complaint, the receivership entities conspired to acquire fraudulently procured policies and to obtain improper benefits from them. They positioned themselves to collect on the fraudulent policies by submitting change of ownership / beneficiary forms, mailing premium payments, and in some cases, submitting death claims. The receivership entities performed these transactions to further the conspiracy. Consequently, VFL, Reassure, Jefferson Pilot, and AUL requested a declaratory judgment that the Mullins, Johnson, Metoyer, and Buchner policies were void *ab initio* (counts V, IX, XV, and XXI).

In the remaining counts the insurers alleged violations of RICO, 18 U.S.C. § 1962 (c) & (d), (counts XIII, XIV, XIX, XX, XXII, and XXIII) and requested modifications of the receivership order and an accounting (counts XXIV and XXV). Two of the insurers, Jefferson Pilot and AUL, alleged damages from racketeering acts directed towards specific policies (the Metoyer and Buchner policies, respectively). Ten other insurers joined together in alleging an additional

claim for damages under RICO, but they did not identify any specific acts of "racketeering" or predicate acts to support their claim.

According to insurers Jefferson Pilot and AUL, the receivership entities participated in a "Viatical Enterprise" that aimed to acquire fraudulently procured life insurance policies, such as the ones pertaining to Metoyer and Buchner. The ultimate goal of this enterprise was to induce insurers to pay benefits on policies that never should have issued, owing to fraudulent misrepresentations during the application process. The insurers allege that the receivership entities violated 18 U.S.C. § 1962(c) by engaging in a pattern of acts that positioned them to collect benefits on the policies and that they used the U.S. mail to accomplish these acts. Moreover, the insurers alleged that the receivership entities also conspired to engage in these acts, violating an additional section of RICO, section 1962(d).

The "pattern of acts" entailed seemingly mundane transactions: posting premium payments and change of ownership / beneficiary notices through the mail. Jefferson Pilot and AUL asserted, however, that the receivership entities performed these acts to further their ultimate goal of obtaining a payout on the ill-gotten policies. The insurers asserted a claim for damages under section 1964(c) of the Act, which authorizes anyone who has been damaged by a RICO violation to pursue a civil claim for treble damages, attorney's fees and costs.

14

Ten of the remaining insurers also asserted separate causes of action pursuant to 18 U.S.C. § 1962(c) & (d) in counts XXII and XXIII of the amended complaint, and requested damages under section 1964(c). However, they provided no details to support these claims, offering only vague assertions that the receivership entities furthered their illegal enterprise through "an as yet undetermined number of telephone conversations and or mailings." Moreover, these insurers failed to identify the specific policies at issue in their RICO claims. Finally, all seventeen insurers joined together in renewing their original request for a modification of the receivership order and a request for an equitable accounting (counts XXIV and XXV).

On May 2, 2005, the receiver moved to dismiss all of the claims in the amended ancillary complaint except for the claim that insurer VFL asserted in count II, which invoked a Pennsylvania insurance fraud statute. The receiver argued that the court should dismiss the other claims for a number of reasons, any one of which provided sufficient grounds to dismiss most of the insurers' claims.

First and foremost, the receiver argued, statutes of limitations barred the insurers from pursuing their claims that the receivership entities had aided and abetted fraud, and violated the FVSA by purchasing the fraudulently procured policies. As the receiver noted, the insurers did not file their original ancillary

complaint until August 31, 2004. However, MBC and/or VBLLC, in the case of the Metoyer policy, had purchased the challenged policies more than four years prior to this. Accordingly, the receiver explained, the insurers' FVSA claims, and aiding and abetting fraud claims were time-barred.

Moreover, the receiver noted, each of the challenged policies contains a two-year incontestability clause, which provides that the insurer cannot contest the policies for any reason after they have been in effect for two years. By the time that MBC purchased the Johnson and Buchner policies, the policies had already been in effect for at least seven years. VBLLC purchased the Metoyer policy three years after the insurer, Jefferson Pilot, issued it, and MBC acquired the Mullins policies two years after VFL issued them. Thus, the receiver argued, the incontestability clauses on all of these policies took effect years ago, and the insurers' request for a declaratory judgment that these policies were void *ab initio* was untimely. Incontestability clauses should also bar the insurers' other fraud-based claims, the receiver maintained, providing an alternative ground to dismiss the aiding and abetting claims, the conspiracy claims, and the RICO claims.

Finally, the receiver argued, the insurers continued to plead their fraud-based claims in very vague terms, defying the requirements that Rule 9(b) of the Federal Rules of Civil Procedure imposes on such pleadings. At a minimum, the

16

insurers failed to name the agents involved in the allegedly fraudulent acts and the dates when the fraud occurred, the receiver contended. They also failed to explain how the receivership entities helped the viators submit fraudulent insurance applications or knew that they lied on their applications. Instead, the receiver noted, they relied upon conclusory statements, asserting that the receivership entities examined the viators' policies and medical records "at some point" before purchasing the policies, and "became aware" of the viators' misrepresentations.

Accordingly, the receiver argued, the court should dismiss each of the claims that alleged the receivership entities knowingly dealt in fraudulently procured policies (the FVSA claims and declaratory judgment claims) for failure to plead fraud with specificity. And, in a similar vein, the receiver also urged the court to dismiss the claims that the receivership entities aided other individuals to commit insurance fraud, or conspired to acquire fraudulently procured policies.

On August 15, 2005, the district court ordered the insurers' amended complaint dismissed in its entirety, giving the insurers until August 29, 2005 to refile any Second Amended Ancillary Complaint. The court cited a number of different grounds for dismissal; however, it did not address each claim specifically. One of the claims that the court left unaddressed in this manner was count II, which the receiver had not asked the court to dismiss.

The court addressed the insurers' FVSA claims (counts I, count VI, count X, and count XVI) first. It found that statute of limitations applied to bar three of the four claims—VFL's (count I), Reassure's (count VI) and AUL's (count XVI). These claims related to the two Mullins policies, the Johnson policy and the Buchner policy. The court did not find the remaining FVSA claim—Jefferson Pilot's claim regarding the Metoyer policy (count X)—time-barred. Nor did it provide a reason for dismissing the claim, apart from an oblique reference in a footnote that discussed the statute of limitations.[7] The footnote stated that the plaintiff[s] had alleged "sufficient facts" to show why the incontestability clause should not apply in the case of the Metoyer policy, and urged the other insurers to refile their claims accordingly.

Although the insurers had argued that the statute of limitations for filing claims under the FVSA would not begin to run until they paid out death benefits

_____

[7]The court referred to "other claims asserted by the [p]laintiffs" in a subheading of the order labeled "[t]he statute of limitations." However, the examples that it listed dealt with the insurers' conspiracy claims and their aiding and abetting fraud claims. The court noted that the insurers failed to state the dates on which these alleged torts occurred, making it difficult to determine whether the claims were, in fact, time-barred. Accordingly, it ordered the remaining claims dismissed without prejudice, allowing the insurers to refile these claims no later than August 29, 2005. In a footnote to this discussion, the court alluded to the Metoyer claim, stating, "If the plaintiffs believe that they can properly allege a fraud claim, then in each newly filed separate complaint each Plaintiff must allege the facts sufficient to show the inapplicability of, or the exceptions to, the contestability clause, as Plaintiffs did in the Amended Complaint with respect to the Metoyer policy." Final Order of Dismissal and Order Denying All Pending Motions As Moot, August 15, 2005, at 8 n.7.

18

on the fraud, the court found otherwise. It held that the statute of limitations on the insurers' FVSA claims began to run when the receivership entities brokered a settlement agreement with the original policyholders. The court's decision turned on a plain reading of the statute, which made it unlawful to "knowingly enter into, broker or otherwise deal in" a viatical settlement contract for a life insurance policy that was procured through fraud. Fla. Stat. § 626.99275(1)(a).

The insurers argued that the court should construe the term "otherwise deal in" to include transactions that occurred after the receivership entities purchased a given policy. According to the insurers, if the receivership entities continued to pay premiums on the policies until the viator died, these transactions would toll the statute of limitations beyond the date when the receivership brokered a viatical settlement. The court agreed with the receiver, however. It found that the Florida legislature intended to limit the term "otherwise deal in" to transactions in which a viatical settlement company or a viator enter into a settlement agreement.

The court analyzed the insurers' aiding and abetting claims next, ordering counts IV, VIII, XII and XVIII dismissed for failure to state a claim upon which relief can be granted. The court acknowledged that the insurers alleged facts sufficient to show that Mullins, Johnson, Metoyer, and Buchner may have procured their life insurance policies through fraud. However, the court

admonished, the insurers did not allege sufficient facts to show how the receivership entities aided these individuals to procure their policies.[8] Their allegations did not state specifically when the receivership entities rendered assistance to the applicants or provide the names of the agents who assisted with the applications.

Moreover, the court noted, the insurers did not explain how the receivership entities actually assisted the applicants to secure insurance coverage. The law does not countenance claims of accessory after the fact in civil fraud claims, the court pointed out. And, in two instances, the applicants tendered their alleged fraudulent forms six years before the receivership entities even came into existence.

The court found that the insurers' conspiracy claims suffered from similar legal deficiencies and ordered counts III, VII, XI, and XVII dismissed for failure to state a claim upon which relief can be granted. The court concluded that the insurers had failed to allege a key element of conspiracy—that there was an agreement to commit an unlawful act. They alleged that the receivership entities

---

[8]In a footnote to this discussion, the court stated that it would not need to address the issue of whether incontestability clauses barred the insurers from asserting aiding and abetting claims, as the receiver argued in his motion to dismiss. Since the insurers had failed to allege sufficient facts to make out a cause of action for aiding and abetting fraud, the court stated that it could dispose of these claims on other grounds. (*See* Fed. R. Civ. Pr. 9(b)). Final Order of Dismissal and Order Denying All Pending Motions As Moot, August 15, 2005, at 11 n.11.

conspired with others such as doctors, agents, and affiliated brokers, to acquire ownership of the Mullins, Johnson, Metoyer, and Buchner policies and to submit claims for benefits under these policies. However, the court noted, the insurers did not allege that these other parties intended to commit an unlawful act. Since a conspiracy requires that two or more individuals agree to commit an unlawful act, the court reasoned, failure to allege intent on the part of these other parties doomed the insurers' conspiracy claims.

The insurers could not salvage these claims by asserting that the receivership entities "conspired among themselves," the court observed, because they are all controlled or owned by MBC. Additionally, the court cautioned, if the alleged unlawful act involves fraud, the insurers would have to allege that with particularity, and they did not do so.

The court addressed the insurers' RICO claims next. It dismissed two of the six RICO claims, counts XXII and XXIII, because the insurers failed to allege any predicate acts and did not allege that the receivership entities' activities caused them specific harm. Indeed, none of the ten insurers who joined in filing these claims could identify a single one of their policies that had been tainted by fraud. Accordingly, the court found that these insurers could not satisfy the constitutional requirements for standing since they did not suffer particularized harm as a result

of the defendants' conduct, and that they likewise failed to state a valid claim for civil damages under RICO.

The other four RICO claims, which insurers Jefferson Pilot and AUL filed, respectively, as counts XIII, XIV, XIX, and XX, did not suffer from the same deficiencies, the court noted. These insurers did allege predicate offenses in connection with two specific policies, the Metoyer and Buchner policies.[9] However, the receiver had argued in his motion to dismiss that these particular claims suffered from another deficiency; namely, they alleged predicate offenses that were no longer legally actionable because statutes of limitations or incontestability clauses barred the insurers from asserting them. The court noted that the receiver had presented persuasive, albeit not controlling, case law in support of this argument.

Ultimately, however, the court declined to address this issue, stating that it was unclear from the face of the amended complaint whether some of the predicate offenses could still be viable. The court remarked that it was difficult to tell from the face of the complaint when certain causes of action accrued, such as the claims

_____

[9]The court refers to the claims as the claims of the "other four Plaintiffs"; however, these four RICO counts represent the claims of just two insurers, Jefferson Pilot and AUL. The other two insurers who brought challenges to specific policies, VFL and Reassure, did not file any RICO claims against the receivership entities. Given that the Amended Ancillary Complaint reads like a "shotgun pleading," we are not surprised to find that the district court had trouble keeping these claims straight.

22

for aiding and abetting fraud, because the insurers simply didn't plead fraud with specificity. Thus, the court did not cite specific grounds for dismissing Jefferson Pilot's and AUL's RICO claims, although it seemed to suggest that the claims suffered from a failure to plead the predicate acts of fraud with specificity.

Nor did the court cite grounds for dismissing count XXV, which requested an equitable accounting, or counts V, IX, XV and XXI, which sought declaratory judgment that the five subject policies were void *ab initio*. The court did order count XXIV, the other count which requested some form of equitable relief, dismissed on specific grounds, however. It found that the insurers failed to state a claim upon which relief could be granted in their request for a modification of the receivership order. If the insurers wanted to modify the receivership order to prevent the receiver from taking any actions that might prejudice their claims, the court advised, they should have asked to intervene in the earlier receivership proceeding. At this point, however, the insurers' efforts to modify the receivership order amounted to an improper collateral attack, the court observed.

In conclusion, the court told the insurers that it would give them until August 29, 2005 to address these deficiencies in a second amended complaint, but that each insurer would have to file individually. The court reminded the insurers that plaintiffs must plead fraud claims with specificity under the Federal Rules,

23

noting that the insurers had failed to heed the court's earlier instructions on this same point. The court also cautioned the insurers against weighing a second amended complaint down with extraneous material that reported on fraud within the viatical industry as a whole. *See* Fed. R. Civ. P. 8(e).

In a footnote to the order, the court stated that it preferred to have each plaintiff file a separate case so that it could "determine the merits of the claims filed by each Plaintiff." The footnote also made passing reference to the one count that had been excluded from the motion to dismiss, but the court referred to it mistakenly as "the one count related to the Metoyer policy."[10] Speaking of this one count, the court suggested that the plaintiff might wish to refile the claim under this same case number for the sake of simplicity, even though the "[r]eceiver has not moved to dismiss the one count relating to the Metoyer policy."

None of the insurers chose to file a Second Amended Ancillary Complaint, allowing the court's deadline to pass. Instead, all seventeen insurers joined in

---

[10]In the conclusion to his motion to dismiss, the receiver stated, "The Receiver respectfully requests that this Court dismiss all counts in the Insurance Companies' Amended Ancillary Complaint with the exception of count II." Receiver's Motion to Dismiss Amended Ancillary Complaint, May 2, 2005, at 31. Count II, as described in the insurer's Amended Ancillary Complaint concerns "Valley Forge Life Insurance Company v. The Receivership Entities Violations of Pennsylvania Insurance Fraud Statute, 18 Pa. Cons. Stat. § 4117." Given that the insurers' amended complaint reads like a "shotgun pleading," we are not surprised to find the district court confused about which count was which.

filing a Notice of Appeal on August 30, 2005, bringing their Amended Ancillary Complaint before this Court.[11]

## STANDARD OF REVIEW

Where an appellant challenges a district court ruling on a Rule 12(b)(6) motion, we review the district court's decision *de novo*. *Hill v. White,* 321 F.3d 1334, 1335 (11th Cir. 2003); *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1139 (11th Cir. 2005). In doing so, we are guided by the same principles of review as the district court. *Stephens v. Dep't of Health & Human Servs.*, 901 F.2d 1571, 1573 (11th Cir. 1990); *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1187 (11th Cir. 2004).

Those principles hold that a court should only grant a motion to dismiss where the defendant demonstrates that the plaintiff cannot prove any set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct 99, 102, 2 L. Ed. 2d 80 (1957). Moreover, when ruling on a motion to dismiss, a court must view the complaint in the light most favorable to

---

[11]Upon joint motion of the appellants and appellees, this Court dismissed the appeal of one of the seventeen insurers, Cherokee National Life Insurance Company ("Cherokee"), on March 17, 2006. The parties moved to dismiss Cherokee after the insurer acknowledged, subsequent to filing the appeal, that it did not have a single policy which was being administered by the receivership.

the plaintiff and accept all of the plaintiff's well-pleaded facts as true. *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 954 (11th Cir. 1986).

If a district court orders a complaint dismissed pursuant to Rule 12(b)(6), but does so *sua sponte*, our standard of review is less clear. *Danow v. Borack*, 197 Fed. Appx. 853, 856 (11th Cir. 2006). A Rule 12(b)(6) motion affords plaintiffs certain procedural protections such as, notice and the opportunity to amend a complaint before the court rules on the motion, the U.S. Supreme Court has noted. *Nietzke v. Williams*, 490 U.S. 319, 329-330, 109 S. Ct. 1827, 1834, 104 L. Ed. 2d 338, 350 (1989). Yet, the Court has cautioned against misconstruing this as an endorsement of *sua sponte* dismissals under Rule 12(b)(6), and has declined to pass judgment on the permissibility of such dismissals. *Id.* at 330 n.8, 109 S. Ct. at 1834, 104 L. Ed. 2d at 350.

However, this Court has prohibited *sua sponte* dismissals under Rule 12(b)(6) where: 1) the defendant had not filed an answer and the plaintiff still had a right to amend his complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure; 2) the plaintiff brought his claim in good faith; and 3) the district court failed to provide the plaintiff with notice of its intent to dismiss or an opportunity to respond. *Jefferson Fourteenth Assocs. v. Wometco de P.R., Inc.*, 695 F.2d 524, 527 (11th Cir. 1983). *Jefferson Fourteenth* involved a case of *sua sponte* dismissal

with prejudice, *id*. at 525, but in this case, the district court dismissed the plaintiff's claim *sua sponte* without prejudice, granting the plaintiff leave to amend the complaint a second time.

Accordingly, we will review the district court's decision to dismiss the insurers' Amended Ancillary Complaint for failure to state a claim pursuant to Rule 12(b)(6) *de novo*. Although the court issued its decision in response to a 12(b)(6) motion, it acted *sua sponte* with respect to one of the insurers' claims, which the receiver had specifically excluded from his motion to dismiss. Nevertheless, the court dismissed this particular claim without prejudice, granting the insurer leave to amend the complaint a second time, thereby neutralizing one of our concerns regarding *sua sponte* dismissals. Since the U.S. Supreme Court has declined to pass judgment on the permissibility of *sua sponte* dismissals under Rule 12(b)(6), and our case law addresses the inapposite situation where the court dismisses a complaint with prejudice, we have no clear precedent. However, we do have rather clear guidelines to apply.

Interpreting provisions in insurance contracts, such as the incontestability clauses which appear here, involves questions of law. *See Elan Pharm. Research Corp. v. Employers Ins.*, 144 F.3d 1372, 1375 (11th Cir. 1998). We also review decisions on matters of law *de novo*. *Id.;Vector Prods. v. Hartford Fire Ins. Co.*,

27

397 F.3d 1316, 1318 (11th Cir. 2005) (citing *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997)). Finally, we note that interpretations of statutes, such as the FVSA provisions on appeal here, also present questions of law that require *de novo* review. *See United States v. Hooshmand*, 931 F.2d 725,737 (11th Cir. 1991).

## ANALYSIS

*I. The FVSA Does Not Govern Transactions with Out-of-State Viators*

The FVSA regulates insurance and investments in insurance products within the State of Florida. Section 626.99275(1)(a) of the Act states that it is unlawful for any person:

> To knowingly enter into, broker, or otherwise deal in a viatical settlement contract the subject of which is a life insurance policy, knowing that the policy was obtained by presenting materially false information concerning any fact material to the policy or by concealing, for the purpose of misleading another, information concerning any fact material to the policy, where the viator or the viator's agent intended to defraud the policy's insurer.

Fla. Stat. § 626.99275(1)(a) (2004). Since MBC, the entity that purchased the viaticals at issue in this case, is a Florida viatical settlement provider, the insurers assert that it is subject to the FVSA.

However, section 626.99245 of the Act, which addresses "Conflict of regulation of viaticals," limits the effect of this provision to in-state viatical

28

settlement companies who contract with in-state residents. According to Fla. Stat.§ 626.99245(2):

> A viatical settlement provider who from this state enters into a viatical settlement contract with a viator who is a resident of another state that has enacted statutes or adopted regulations governing viatical settlement contracts shall be governed in the effectuation of that viatical settlement contract by the statutes and regulations of the viator's state of residence. If the state in which the viator is a resident has not enacted statutes or regulations governing viatical settlement agreements, the provider shall give the viator notice that neither Florida nor his or her state regulates the transaction upon which he or she is entering.

None of the viators named in the insurers' amended complaint resided within the State of Florida when they sold the interests in their life insurance policies to MBC. Wendell Mullins, whose policy is the subject of an FVSA claim by insurer VFL, resided in Arkansas when he first obtained his policy from insurer VFL and later in West Virginia. Jack Johnson, whose policy is the subject of a FVSA claim by insurer Reassure, resided in Massachusetts. Gerald Metoyer, the viator named in the FVSA claim by Jefferson Pilot, resided in California at the time that he assigned his policy to VBLLC, which is owned by MBC. Lastly, William Buchner, the viator whose policy is the subject of insurer AUL's FVSA claim, was a resident of Illinois.

Thus, a plain reading of this provision of the statute indicates that the FVSA does not govern MBC's settlement contracts with any of these viators. Accordingly, we find that the insurers' reliance upon section 626.99275(1)(a) of the statute is misplaced, and they are not entitled to relief under this statute. The district court dismissed three of the insurers' four FVSA claims (counts I, VI, and XVI, or the VFL, Reassure, and AUL claims) as time-barred under Florida's statute of limitations for fraud. We find that the dismissal of these three claims was proper, albeit for a different reason than the one the district court cited.[12]

Although the receiver did not raise the conflict of law issue before the district court, we may, nevertheless, affirm a district court's decision to grant or deny a motion for any reason, regardless of whether it was raised below. *See Lucas v. W.W. Grainger, Inc*., 257 F.3d 1249, 1256 (11th Cir. 2001) (we may affirm "on any ground that finds support in the record"). Additionally, we note that the conflict of law provision in the FVSA also bars count X, the claim that Jefferson Pilot filed in relation to the Metoyer policy. The district court did not provide a specific reason for dismissing this claim as it did with the other FVSA claims.

---

[12]The district court ordered the insurers' FVSA claims dismissed because it found that they were time-barred. The court based this conclusion on the language in Fla. Stat. § 626.99275(1)(a), which makes it unlawful for any person to knowingly "enter into, broker or otherwise deal in" a viatical for a life insurance policy that was procured through fraud. We need not reach the question of whether the district court's interpretation of the "otherwise deal in" language of the Florida statute was correct.

30

Nonetheless, given that the conflict of law provision applies here as well, we affirm the court's decision to dismiss this claim.

## II. Fraud Claims Barred Once Contestability Period For Policies Has Passed

Each of the life insurance policies that the insurers challenged in their amended complaint contain two-year incontestability clauses. As we noted recently in *Allstate Life Insurance Co. v. Miller*, 424 F.3d 1113, 1115 (11th Cir. 2005) (*citing Prudential Ins. Co. of Am. v. Prescott*, 176 So. 875, 878 (Fla. 1937)), incontestability clauses function much like statutes of limitations. While they recognize fraud and all other defenses, they provide insurance companies with a reasonable time in which to assert such defenses, and disallow them thereafter. In each of the cases at issue here, contestability periods ended years ago. In some cases they ended only one or two years before the insurers filed their complaint; in other cases they ended more than fifteen years before the insurers filed a complaint.

Nevertheless, to determine whether the insurers can challenge these policies at this late date, we must first determine what law will guide our interpretation of the contracts. Federal courts adjudicating state law claims apply the substantive law of the state where they render decisions. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 822, 82 L. Ed. 1188 (1938). Here, the forum state is

31

Florida, but none of the parties to the challenged contracts are citizens of Florida, a situation which raises conflict of law concerns. In such cases, we follow the conflict of law rules of the forum state. *See Klaxon Co. v. Stentor Elective Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 1021, 85 L. Ed. 1477, 1480 (1941).

Absent a specific contractual provision to the contrary, Florida conflict of law rules dictate that courts should apply *lex loci contractus*, or the law of the state where the contract was made, to questions of contracts (other than those that deal with contracts for the performance of services). *See Equitable Life Assurance Soc'y v. McRee*, 78 So. 22, 24 (Fla. 1918); *Shaps v. Provident Life & Accident Ins. Co.*, 244 F.3d 876, 881 (11th Cir. 2001) (relying on *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995)). When the contract deals with an insurance policy, the *locus contractus* is generally the state where the insured executed the insurance application. *See Fioretti,* 53 F.3d at 1236; *Shaps,* 244 F.3d at 881. Accordingly, we approach this analysis by examining each of the policies in turn with respect to the insurers' claims that the policies were: 1) void *ab initio* on account of fraud, 2) that the receivership entities aided and abetted fraud, and 3) that the receivership entities conspired to commit fraud. Since two of the insurers, Jefferson Pilot and AUL, also asserted RICO claims based on predicate acts of mail fraud, we will consider those claims under this section as well.

## A. The Wendell Mullins Policies Issued by VFL

Wendell Mullins, a resident of Arkansas, applied for two $1 million policies through insurer VFL on November 17, 1997. Mullins executed the applications at a VFL broker's office in Waterville, Ohio. In response to a query on VFL's insurance application as to whether he had ever been diagnosed or treated for AIDS in the past ten years, Mullins checked the answer choice labeled "no."[13] Apparently, he had tested positive for HIV in 1994. Mullins submitted to a blood test on February 10, 1998 at VFL's request and passed, showing no signs of HIV infection. VFL contended that Mullins likely enlisted the aid of an impostor who took the blood test in his place, but the insurer was unable to provide further details of how this worked.

After Mullins passed the blood test, VFL issued two $1 million life insurance policies to him on March 23, 1998. The policies contained identical incontestability clauses, which read:

---

[13]Clinically speaking, a diagnosis of HIV does not mean the same thing as a diagnosis of AIDS. HIV infection results in an AIDS diagnosis only after an individual develops a number of opportunistic infections and his CD4 positive T-cell count falls below a certain number. Some individuals who have tested positive for exposure to HIV remain asymptomatic for ten years or more. *See* National Institutes of Health, *HIV Infection and AIDS: An Overview (2005)*, *at* http://www.niaid.nih.gov/factsheets/hivinf.htm.Thus, it is not entirely clear that Mullins intended to misrepresent his medical history when he answered that he had not been diagnosed with AIDS, even though many individuals conflate the two conditions.

[Valley Forge] cannot contest this policy, except for non-payment of premiums, after it has been in force during the Insured's lifetime for 2 years from the Policy Date or if reinstated the date of reinstatement.

Two years later, Mullins asked to have the policies amended in order to exercise an option for a Guaranteed Insurance Rider ("GIR") that VFL had offered under an earlier policy. The GIR on the earlier policy gave Mullins the right to purchase additional insurance up to two times the initial face amount of the policy, without having to answer additional medical questions, present evidence of insurability or attest to current employment. Mullins executed the amendment to the policies in Charleston, West Virginia on March 15, 2000. VFL alleged that the amendment to the policies is fake, and that MBC submitted a doctored version of Mullins' original application and other false correspondence in support of the amendment.

MBC viaticated both of the Mullins policies within a few months of their amendment, in May and June 2000. By this point in time, the policies had been in force for at least two years and the contestability period had expired. Mullins died of AIDS-related complications on September 24, 2003. VSI submitted claims on both his policies on January 27, 2004. VFL did not allege fraud in connection with the Mullins policies until August 31, 2004, however, when the insurers filed their original ancillary complaint. VFL amended the complaint on March 15, 2005 to

34

allege additional claims in connection with the Mullins' policies such as aiding and abetting fraud, civil conspiracy, and RICO claims. Thus, VFL did not seek to challenge the policies until long after the incontestability bar took effect.

To determine whether the incontestability clauses absolutely bar VFL from asserting fraud-based claims at this point, we must look to the law of the state where Mullins executed the contracts. The receiver contends that Mullins filed the last document required to complete the contract in West Virginia because that is where he signed the amendment to the policies. The insurers argue that the purported final amendment is a fake, and that Ohio law applies because that it where Mullins signed his original applications for insurance.

Regardless of whether we apply West Virginia law or the law of Ohio, the result is the same. Neither state will bar enforcement of an incontestability clause on the grounds of fraudulent procurement once the two-year contestability period has lapsed. *See e.g.*, *Morris v. Mo. State Life Ins. Co.*, 114 W. Va. 278, 281, 171 S.E. 740, 741 (1933) ("fraud in the procurement of the policy cannot be made a defense subsequent to the date fixed by the policy when it shall be deemed incontestable"); *see also Poffenbarger v. N. Y. Life Ins. Co.*, 277 F. Supp. 726, 729 (D. W. Va. 1967) (affirming *Morris).*

An Ohio statute plainly dictates that any life insurance policy that is issued by a company organized under the laws of the state or delivered to an insured within the state must contain a provision that: "[it] shall be incontestable after it has been in force during the lifetime of the insured for a period of not more than two years from its date, except for nonpayment of premiums." Ohio Rev. Code Ann. § 3915.05(C) (1998). The statute does not provide for any exceptions on account of fraud. Although the insurers argue that Ohio case law recognizes an exception where the insured lacked an insurable interest at the time he applied for the policy,[14] they do not state why that exception should apply. The insurable interest doctrine holds that a person who procures a life insurance policy on the life of another person must have an insurable interest in the continuation of that other person's life. *See Couch on Insurance* § 41:17 (3d ed. 1997). Failure to

---

[14]In a parenthetical to a citation to *Turek v. Vaughn*, 154 Ohio App. 3d 612 (Ct. App. 2003), the insurers state that the court observed that, "as a matter of public policy, the validity of an insurance contract is dependent upon the insured having an insurable interest in the subject of the insurance." Principal Brief of Appellants at 43 n.12. *Turek* did not deal with a life insurance policy; it concerned a policy for automobile insurance. The insurers also cite *Ryan v. Rothweiler*, 50 Ohio St. 595, 601, 35 N.E. 679, 681 (1893), as holding that a "policy is void if there was no insurable interest at inception of policy." Appellants' Brief at 43 n.12. However, to clarify what this meant with respect to life insurance policies, the court noted that although "a man may cause his own life to be insured for the benefit of a stranger, and the want of insurable interest in the stranger will not invalidate the policy, a policy taken out by a man for his own benefit on the life of a stranger, would be void for want of insurable interest." *Rothweiler*, 50 Ohio St. at 601, 35 N.E. at 681.

disclose an HIV infection may affect an insured's premium rates, but that does not mean he would lack an "insurable interest," as the term is understood in the law.

Thus, we affirm the district court's decision to dismiss VFL's request to declare the Mullins policies void *ab initio* and its common law fraud and civil conspiracy claims (counts V, III, and IV, respectively). Although the court did not specifically find that these claims were barred under the policies' incontestability clauses, we do find this to be the case. And, as we noted previously, we may affirm the district court's decision to dismiss on any grounds that finds support in the record. *See, e.g., W.W. Grainger,* 257 F.3d at 1256.

## B. The Jack Johnson Policies Issued by Reassure

On June 6, 1988, Jack Johnson, a resident of Massachusetts, applied for a $100,000.00 life insurance policy through Allianz Life Insurance Company of North America, whose policies are administered by Reassure. Johnson submitted the application in Massachusetts. In response to a query on the insurance application as to whether he had ever been treated for or diagnosed with an immune system disorder or a disorder of the blood, Johnson answered "no." Reassure contended that doctors had diagnosed Johnson with HIV in 1986.

Allianz issued a $100,000.00 life insurance policy to Johnson on August 8, 1988. The policy contained an incontestability clause that read:

37

The application you signed is a legal document. If the information on your application was false and we relied on that false information and gave you insurance that you were not entitled to, we may treat your insurance as if we never issued it to you ... However, we will not question any information that you gave us on the application if this certificate has been in effect for 2 years during your lifetime.

Allianz reduced Johnson's coverage to $50,000.00 on March 10, 1993, after it discovered an error on the Certification Schedule that was used to compute his premium rates. Johnson assigned the policy to MBC on November 29, 1995. At that point, the policy had been in effect for more than seven years. Johnson died of AIDS on June 6, 2004. Reassure did not allege fraud in connection with the Johnson policy until the insurers filed their amended ancillary complaint on March 15, 2005.

Since Johnson executed his application in Massachusetts, we apply Massachusetts law to determine whether Reassure can assert any exceptions to the incontestablity clause. Under the General Laws of the Commonwealth of Massachusetts, a life insurance policy issued within the Commonwealth must contain:

A provision that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of two years from its date of issue except for non-payment of premiums or violation of the conditions of the policy relating to military or naval service in time of war and except, if the company so elects, for the purpose of contesting claims for total and permanent disability benefits or additional benefits specifically granted in case of death by accident.

38

Mass. Gen. Laws ch. 175, § 132(2) (1989). The statute does not contain an exception for fraud. And the Legislature omitted any mention of fraud intentionally, the Massachusetts Supreme Judicial Court concluded in *Protective Life Ins. Co. v. Sullivan*, 425 Mass. 615, 620, 682 N.E.2d 624, 628-29 (1997). The facts of *Sullivan* are similar to those that Reassure alleges here, namely, that an HIV-positive individual failed to disclose his infection when he applied for a life insurance policy. The insurer issued a policy in reliance upon the insured's fraudulent application and did not discover the fraud until the insured died of AIDS. By that time, the incontestability period on the policy had expired. The insurer sought to rescind the policy on the grounds of fraud. Although the court noted that the insured's wilful concealment of his medical condition was "deplorable," and deserving of "condemnation," it held that the Massachusetts legislature did not intend to provide a fraud exception to the state incontestability statute for sound policy reasons. *Id*. at 629, 682 N.E.2d at 634.

Accordingly, we find that the incontestability clause in the Johnson policy bars Reassure from challenging the validity of the policy on the basis of fraud, and we affirm the district court's decision to dismiss Reassure's claim for a declaratory judgment that the policy was void *ab initio* (count IX). The incontestability clause

also necessarily bars Reassure from pursuing its other fraud-based claims—that the receivership entities aided and abetted Johnson to commit fraud (count VIII) and that they conspired to acquire his fraudulently procured policy and to submit a claim for improper benefits once he died (count VII). Thus, we also affirm the district court's decision to dismiss these claims, even though the district court did not specifically reach the issue of whether these claims were barred by the incontestability clause in Johnson's policy.

## C. The Gerald Metoyer Policy Issued by Jefferson Pilot

Gerald Metoyer, a California resident, applied for a $1.5 million life insurance policy from Jefferson Pilot on February 13, 1999. He signed the application in California. A query on the insurance application asked whether he had been diagnosed or treated within the past seven years for either AIDS, an AIDS-related complex, or HIV. Metoyer responded "no." Metoyer also denied ever being treated for cancer in response to another query on the application.

According to count X of the insurers' complaint, doctors had diagnosed Metoyer with both HIV and cancer in 1993. Metoyer submitted to medical tests and blood tests as part of the application process, but the tests did not disclose evidence of either condition. Jefferson Pilot argued that Metoyer most likely enlisted the aid of an impostor when it came time to take these tests. Jefferson

Pilot did not allege further details of how Metoyer managed to accomplish this fraud or identify the impostor who stood in for him during the medical tests.

On February 25, 1999, Jefferson Pilot issued Metoyer a $1 million policy on his life. Thereafter, Metoyer asked to raise the policy limits closer to $2 million, and on April 18, 1999, Jefferson Pilot complied, raising the coverage to $1.5 million. The policy contained a two-year incontestability clause, in keeping with the California Insurance Code, which requires that:

> An individual life insurance policy delivered or issued for delivery in this state shall contain a provision that it is incontestable after it has been in force, during the lifetime of the insured, for a period of not more than two years after its date of issue.

Cal. Ins. Code § 10113.5(a) (1999). Metoyer assigned his policy to VBLLC on May 6, 2002. VSI began to service the policy shortly thereafter, paying regular premiums to ensure that it remained in force and submitting change of ownership / beneficiary notices. The receivership entities did not submit any claims for benefits under the policy as Metoyer is still alive. Nevertheless, on March 15, 2005, Jefferson Pilot asked the court to declare that the policy was void *ab initio* to relieve the company from its future obligations on the policy. At this point in time, the policy had been in effect for six years and the contestability period had lapsed four years earlier.

Under California law, once the contestability period has expired on a life insurance policy, an insurance company can no longer contest the policy for reasons of fraudulent procurement. *Amex Life Assurance Co. v. Superior Court*, 14 Cal. 4th 1231, 1233-34, 930 P.2d 1264, 1265 (1997). The contestability period on the Metoyer claim expired on February 25, 2001. The insurers contended in their brief that California amended its insurance code in 1998, the year that Jefferson Pilot issued the Metoyer policy, to allow challenges to policies in cases where the policies had been procured with the aid of impostors.

The pertinent provision only applies, however, "if photographic identification is presented during the application process, and if an impostor is substituted for a named insured in any part of the application process." Cal. Ins. Code § 10113.5(b)(1) (1999). In such cases, the California Insurance Code states that "any purported insurance contract is void from its inception." *Id*. The record does not indicate whether Jefferson Pilot required that Metoyer present photographic identification during the application process. Jefferson Pilot merely alleges that Metoyer likely made use of an impostor to obtain the medical results that he did, which made him appear AIDS and cancer-free at the time he applied for life insurance.

The district court found that the plaintiffs had alleged "sufficient facts" to show why the incontestability clause should not apply in the case of the Metoyer policy. Final Order of Dismissal and Order Denying All Pending Motions As Moot, August 15, 2005, at 8 n.7. We do not know which facts the court was alluding to in this footnote. California law on incontestability clauses does provide a limited exception for fraud in cases where an impostor is used. However, it simply is not clear whether this exception applies in Jefferson Pilot's case because Jefferson Pilot has failed to provide the necessary details of the alleged fraud.

Accordingly, we make no finding as to whether the incontestability clause applies to bar Jefferson Pilot's fraud claims. Nevertheless, we do agree with the district court that Jefferson Pilot's fraud claims suffer from a more basic problem—failure to plead fraud with particularity—and this deficiency provides grounds for dismissal. As we noted in *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 568 (11th Cir. 1994), "the plaintiff's complaint must allege the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." Jefferson Pilot's allegations do not satisfy this requirement since they fail to allege unequivocally that an impostor stood in for Metoyer when it came time to submit to medical exams, when this fraud occurred, or what

involvement the receivership entities had in perpetrating or perpetuating this fraud (*see infra*).

Accordingly, we affirm the district court's decision to dismiss Jefferson Pilot's claim for a declaratory judgment that the Metoyer policy was void *ab initio* (count XV). We do so because Jefferson Pilot presented only general conclusory allegations of fraud and conjecture on the use of an impostor. Such general conclusory allegations do not conform to the heightened pleading requirements for fraud claims. *See* Fed. R. Civ. P. 9(b).

Jefferson Pilot's remaining fraud claims—the aiding and abetting claim (count XII) and the conspiracy to commit fraud claim (count XI)—suffer from the same deficiency. As the district court noted in its dismissal order, Jefferson Pilot failed to allege any facts that would show how the receivership entities assisted Metoyer to file a fraudulent insurance application. Thus, Jefferson Pilot's aiding and abetting claim also fails to conform to the requirements of Rule 9(b) of the Federal Rules of Civil Procedure. And, as the district court noted, where a conspiracy claim alleges that two or more parties agreed to commit fraud, the plaintiff must also plead this act with specificity. Jefferson Pilot did not do so in this case and consequently, failed to make out a valid claim for conspiracy to

commit fraud. Accordingly, we affirm the district court's decision to dismiss these two claims.

Jefferson Pilot also asserted two RICO claims against the receivership entities pursuant to section 1962(c) and (d) of Title 18 of the U.S. Code. Section 1962(c) makes it unlawful for anyone employed by or associated with an enterprise affecting interstate or foreign commerce to conduct the enterprise's affairs through a "pattern of racketeering activity." Section 1962(d) makes it unlawful to conspire to violate section 1962(c).

Section 1961(1)(a) and (b) of the RICO statute provides a list of crimes or threats that constitute an "act of racketeering" for the purposes of section 1962(c). The list includes major crimes such as murder, arson, etc. that are chargeable under State law and punishable by imprisonment of more than a year, and crimes that are indictable under various sections of the United States Code, such as the mail fraud statute. To assert a "pattern of racketeering activity," a plaintiff must allege that the defendant engaged in at least two discrete acts from the preceding list of predicate acts. 18 U.S.C. § 1961(5).

Jefferson Pilot based its RICO claims (counts XIII and XIV) on two predicate acts of mail fraud. The district court did not provide a reason for dismissing these two claims, but, and as we have noted above, the district court

45

justifiably decried Jefferson Pilot's other fraud allegations for their lack of specificity. Thus, the court could have properly concluded that Jefferson Pilot failed to plead the predicate acts of mail fraud with the particularity required under Rule 9(b) of the Federal Rules of Civil Procedure. Jefferson Pilot's mail fraud allegations suffer from an additional deficiency, however.

Under the mail fraud statute, a plaintiff must allege a scheme to defraud where "some type of deceptive conduct occurred." *Pelletier v. Zweifel*, 921 F.2d 1465, 1500 (11th Cir. 1991). Jefferson Pilot did not allege that the receivership entities made any affirmative misrepresentations in these mailings. Rather, it seemed to suggest that the receivership entities engaged in a scheme to defraud the insurer because they failed to disclose what they learned in the process of acquiring the Metoyer policy.

We have stated that "nondisclosure of material information can constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose either by statute or otherwise." *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002). However, as the district court noted in its order to dismiss, if the insurers intended to assert a claim for fraudulent concealment, or nondisclosure, they needed to plead that the receivership entities had a duty to disclose. Jefferson Pilot did not do so in the amended complaint. Accordingly, it

46

failed to state a claim upon which relief can be granted and we affirm the district court's dismissal of Jefferson Pilot's RICO claims for this reason.

## D. The William Buchner Policy Issued by AUL

William Buchner, a resident of Illinois, applied for a $100,000.00 life insurance policy with AUL on March 5, 1986. AUL asserts that he had been diagnosed with HIV in 1985. AUL had Buchner complete an interview with a medical examiner on April 14, 1986 as part of the application process and the examiner asked Buchner whether he had been diagnosed within the past ten years with any symptoms of a blood disorder or been affected by any serious illness, disease, or injury not listed on the application. Buchner did not disclose his HIV infection.

On April 28, 1986, AUL issued Buchner a $100,000.00 life insurance policy, which contained the following incontestability clause:

> INCONTESTABILITY. This policy will not be contested after it has been in force during the lifetime of the insured for 2 years from its date of issue.

Buchner assigned his policy to MBC on July 20, 1995. Thus, Buchner held the policy for at least nine years before he assigned it, and the contestability period expired seven years earlier. AUL did not assert that Buchner procured the policy through fraud or that the receivership aided and abetted his efforts until the

47

insurers filed their amended ancillary complaint on March 15, 2005. Buchner is still alive, and the receivership entities have not asserted a claim for benefits on his policy.

Since Buchner executed his insurance application in Illinois, we apply Illinois law to determine whether AUL can challenge the validity of the Buchner policy at this point. Illinois, like the other states that we have examined, does not recognize a fraud exception to incontestability clauses. The Supreme Court of Illinois held as far back as 1921 that the incontestability clause in a life insurance policy is "a valid provision, which bars the insurer from making any defense against the policy, after the expiration of the contestable period, except for nonpayment of premiums." *Ramsay v. Old Colony Life Ins. Co.*, 297 Ill. 592, 595, 131 N.E. 108, 109 (1921). The court cautioned that "even fraud in procuring the policy is not available [as a defense] to avoid [the effect of the incontestability clause]." *Id*.

Thus, we find that AUL's claim for a declaratory judgment that the Buchner policy was void *ab initio* on the grounds of fraud (count XXI) is time-barred since the contestability period on the policy expired nearly twenty years ago. Additionally, the incontestability clause in the Buchner policy also bars AUL's other claims, which all rely upon allegations that the Buchner policy is tainted by

fraud. AUL's other claims include the aiding and abetting fraud (count XVIII), a conspiracy claim (count XVII), and two RICO claims predicated on mail fraud (count XIX and XX). Once again, we affirm the district court's decision to dismiss these claims even though the court reached its decision for alternative reasons.

*III. Alternative Grounds to Dismiss Fraud, Conspiracy and RICO Claims*

A. Fraud Claims: Failure to Plead Fraud with Specificity, Rule 9(b).

As we noted previously, a court must view a complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true when it considers a motion to dismiss a complaint under Rule 12(b)(6). *St. Joseph's Hosp.,* 795 F.2d at 954 (11th Cir. 1986). Unfortunately, the plaintiffs simply have not asserted that many "well-pleaded facts" in this case.

The Federal Rules of Civil Procedure advise plaintiffs on the general rules of pleading in Rule 8, and the special rules for pleading fraud, mistake, or condition of the mind in Rule 9. Rule 8(a)(2) states that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. If the claim alleges fraud, however, as the majority of the insurers' claims do in this case, Rule 9(b) dictates that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).

When we review the insurers' amended complaint against this standard, we find, as the district court did, that many of the claims fail to comport with the requirements of Rule 9(b). None of the claims which allege that the receivership entities aided and abetted insurance fraud (counts IV, VIII, XII, and XVIII) identify the agents or corporate representatives who participated in the alleged fraud. Nor do they identify the dates when the agents rendered assistance or explain how their conduct furthered the commission of insurance fraud. This is particularly problematic since the receivership entities were not even in existence when William Buchner and Jack Johnson are alleged to have committed the acts of insurance fraud that underlie two of the four aiding and abetting claims (those involving AUL and Reassure). *See supra* note 2.

The district court found that the insurers' aiding and abetting claims failed to plead fraud with specificity, and ordered the claims dismissed for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Although we have found that three of the insurers' claims fail because of incontestability clauses in the insurance contracts,[15] the district court's rationale for dismissing

---

[15]We agree with the district court that Jefferson Pilot's aiding and abetting claim (count XII) and its civil conspiracy claim (count XI) fail to plead fraud with specificity and should be dismissed. *See supra* pp. 44-45. We do not find that Jefferson Pilot's claim was time-barred by operation of an incontestability clause, as we did with respect to the other insurers' claims for aiding and abetting fraud and civil conspiracy.

these claims provides an alternative independent ground upon which to dismiss counts IV, VIII, and XVIII. We agree with the ruling of the district court on this ground.

### B. Conspiracy Claims: Failure to Allege an "Unlawful Act" & Rule 9(b)

The elements that a plaintiff must allege for a conspiracy claim are that 1) two or more parties 2) agree 3) to commit an unlawful act. Under Florida law, the "gist of a civil conspiracy is not the conspiracy itself but the civil wrong which is done through the conspiracy which results in injury to the Plaintiff." *Czarnecki v. Roller*, 726 F. Supp. 832, 840 (S.D. Fla. 1989) (quoting *Buckner v. Lower Florida Keys Hosp. Dist.*, 403 So. 2d 1025, 1027 (Fla. Dist. Ct. App. 1981)). Thus, as this Court has noted, a claim that is found not to be actionable cannot serve as the basis for a conspiracy claim. *See Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217 (11th Cir. 1999) (applying Florida law).

Insurers VFL, Reassure, Jefferson Pilot and AUL allege that the receivership entities conspired to acquire fraudulently procured policies "in violation of the FVSA, Fla. Stat. § 626.99275(1)(a)." As we have already noted, however, the FVSA does not govern the receivership entities' actions with respect to the policies named in these claims because they concern out-of-state viators.

The insurers cannot invoke the FVSA as the basis for a conspiracy claim in this case.

The insurers' civil conspiracy claims also fail to comport with the standards of Rule 9(b). As the district court noted, where a conspiracy claim alleges that two or more parties agreed to commit fraud, the plaintiffs must plead this act with specificity. Here, the insurers provided only conclusory statements. They did not explain how the receivership entities knew that the policies had been procured by fraud. The only explanation offered was that the receivership entities extensively evaluated the health of prospective viators before they tendered settlement offers. This is not sufficient.

The insurers also failed to state when the receivership entities and their network of unnamed brokers, agents, investors, and physicians agreed to engage in this fraudulent purchasing scheme or "Acquisition Conspiracy." Nor did they allege that the receivership entities sought to acquire these policies after the contestability periods had expired. Accordingly, we find, as the district court suggested, that failure to plead fraud with specificity provides an alternative ground for dismissing the insurers' conspiracy claims.

C. AUL's RICO Claims Fail If The Predicate Acts Are No Longer Actionable

The district court did not provide a reason for dismissing the RICO claims that AUL filed with respect to the Buchner viatical. Nevertheless, we are affirming the court's decision to dismiss all of AUL's fraud claims, including the two RICO claims, because we found the claims were time-barred. The district court dismissed AUL's other fraud claims because they did not conform to the heightened pleading requirements for fraud under Rule 9(b) of the Federal Rules of Civil Procedure. We have said this represents an independent alternative ground upon which to dismiss these particular claims. *See supra* pp. 50-51.

Once the district court dismissed these two fraud claims, it could have also properly dismissed AUL's RICO claims since such claims cannot be maintained if the underlying predicate acts lack legal validity. And, absent any valid predicate acts, the insurers cannot state a claim for RICO violations. *See Green Leaf Nursery v. E.I. Dupont De Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003).

D. Grounds for Dismissal of Remaining RICO Claims: Lack of Standing

Ten other insurers also filed RICO claims as part of the amended ancillary complaint, but these insurers did not ground their RICO claims in specific predicate acts, as the law requires. *See* 18 U.S.C. §§ 1961(1)(a),(b), 1961(5). Instead, they alleged that the receivership entities engaged in "an as yet undetermined number of telephone conversations and or mailings" involving an

53

"undetermined number" of fraudulently procured policies. The insurers not only failed to identify the specific policies addressed in these mailings, they also failed to allege that they suffered any particularized harm as a result of the defendants' activities. The district court dismissed these two claims, counts XXII and XXIII, for failure to state a claim and for lack of standing.[16] We affirm the district court's decision on these same grounds.

*IV. The Pennsylvania Fraud Claim Fails to Satisfy The Requirements of Rule 9(b)*

Although the receiver did not move to dismiss count II of the insurers' amended ancillary complaint, in which VFL alleged a violation of a Pennsylvania insurance fraud statute, the district court ordered the entire amended complaint dismissed. As we noted in our previous discussion, the district did not provide a reason for this *sua sponte* dismissal. Indeed, it is possible that the court dismissed the claim inadvertently. It did acknowledge that the receiver had excluded one

---

[16]The standing requirement is derived from Article III of the Constitution, which provides that federal courts may only hear "cases or controversies."*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992). To establish that a "controversy"exists, a plaintiff must show that he suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id*. at 560-61, 112 S. Ct. at 2136. By failing to allege that they suffered a particularized harm from the activities of the receivership entities, these ten insurers have failed to show that they meet the constitutional requirements for standing.

count from his motion to dismiss, but it mistakenly referred to the count as "the one count related to the Metoyer policy."[17] Interestingly, neither of the parties asked the court to clarify its order on this point, although the mistake was fairly glaring.

We would not be surprised to find that the court confused the counts. The insurers' amended complaint presents an extreme example of a "shotgun pleading." The district court had to wade through a great deal of extraneous material that addressed fraud in the viatical settlement industry as a whole. The insurers disregarded the court's earlier admonitions to keep this sort of material out of their amended complaint and to plead each allegation of fraud with specificity, identifying the agents who participated in the fraud, the dates on which it occurred, etc.

Regardless of why the court dismissed count II, we may still review the dismissal to see whether it falls within the parameters that appear in the cases dealing with *sua sponte* dismissals. As we noted in *Jefferson Fourteenth,* 695 F.2d at 527*,* a *sua sponte* dismissal under Rule 12(b)(6) will not stand where: 1) the

---

[17]Speaking of this one count in a footnote to its order of dismissal, the court suggested that the plaintiff might wish to refile the claim under this same case number for the sake of simplicity, even though the "[r]eceiver has not moved to dismiss the one count relating to the Metoyer policy."

defendant has not filed an answer and the plaintiff still had a right to amend his complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure; 2) the plaintiff has brought his claim in good faith; and 3) the district court has failed to provide the plaintiff with notice of its intent to dismiss or an opportunity to respond.

When we evaluate the court's dismissal here against this standard, we find that the dismissal should stand. Although the receiver had not yet filed an answer in this case, the insurers had availed themselves of their right to file an amended complaint. The court also provided the insurers with ample opportunity to respond, dismissing the claims in their Amended Complaint *without prejudice* and specifically giving them leave to file a Second Amended Ancillary Complaint by August 29, 2005. The insurers rejected this offer, and filed this appeal. The insurers did not request clarification of the court's dismissal order, although the court's erroneous reference to claim which dealt with the Mullins' policies as the "Metoyer" claim begged for clarification. The insurers did not file a Second Amended Ancillary Complaint, although the court freely granted them leave to do so. And, although the court cautioned the insurers when it dismissed their original Ancillary Complaint that they must plead fraud with particularity, they did not heed the court's clear notice on this subject and filed similarly defective pleadings

in their Amended Ancillary Complaint. Thus, this case does not fall within the purview of those cases condemning *sua sponte* dismissals. *See, id.*

Finally, we note that the statutory fraud violation which VFL alleged in count II reads much like its common law fraud claim, which the district court dismissed for failure to plead fraud with specificity. The statute at issue in count II is Pennsylvania's Insurance Fraud Prevention Statute, 18 Pa. Cons. Stat. § 4117(a), which defines a violation as any of the following:

> (2) Knowingly and with intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim.
> (3) Knowingly and with the intent to defraud any insurer or self-insured assists, abets, solicits or conspires with another to prepare or make any statement that is intended to be presented to any insurer or self-insured in connection with, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim.

VFL asserted that the receivership entities violated both of these sections of the statute. *See* Appellants' Amended Ancillary Complaint, Count II, ¶¶ 87-88. More specifically, VFL contended that the receivership entities submitted doctored documents which purported to be copies of Mullins' original insurance applications when they filed claims for Mullins' death benefits. VFL alleged that someone—it did not identify the actual agent—altered the applications so as to

57

make it appear that the insurer had issued them pursuant to a GIR. The GIR would have given Mullins the option to purchase additional insurance without having to answer questions on his health, or attest to his insurability. VFL also alleged that someone used "white-out" to reverse the column headings for "Yes" and "No" answers in the medical history section of the applications.

As we noted, VFL did not allege which of the receivership entities' agents or corporate representatives engaged in this fraud, or the date when the agent "assisted another to prepare or make" these changes to the insurance application. VFL did not state whether the receivership entities made these changes before Mullins' death on September 24, 2003 and with his assistance, or after his death, furnishing assistance to some other party. VFL backed the claim up by asserting that it does not use blue ink on GIR stamps or label its checkboxes "No/Yes" as the allegedly doctored applications do. Moreover, VFL argued that it never would have asked Mullins to submit to a medical exam if, in fact, it had issued his policies pursuant to GIRs.

In broad conclusory language, VFL alleges intent, material misrepresentation, reliance, and damages. It does not, however, plead any details as to how the receivership entities accomplished the alleged fraud. It fails to identify which agents, if any, participated in the scheme to doctor copies of

58

Mullins' applications. Thus, we find that this claim is properly dismissed for the same reason that the district court dismissed VFL's common law fraud claims: lack of specificity in pleading fraud as required under Federal Rule of Civil Procedure 9(b).

*V. The Court Properly Dismissed the Insurers' Claims for Equitable Relief*

Counts XXIV and XXV of the insurers' amended complaint presented claims for a modification of the receivership order and for an accounting. The district court dismissed both claims, but issued a specific finding solely with respect to count XXIV. The court found that the request to modify the receiver's order through an ancillary complaint represented an improper collateral attack. Thus, the court dismissed the claim for failure to state a cause of action upon which relief could be granted, and we affirm the court's decision for the same reason.

With respect to count XXV, we find that the request for an accounting is improper. Under Florida law, a party that seeks an equitable accounting must show that: 1) the parties share a fiduciary relationship or that the questioned transactions are complex, and 2) a remedy at law is inadequate. *Kee v. Nat'l Res. Ins. Co.*, 918 F.2d 1538, 1540 (11th Cir. 1990). The insurers have not met any of these preconditions.

59

The receivership entities do not share a fiduciary relationship with the insurers. They are not their brokers. The insurers insist that they do not know how many of their policies were caught up in the "web of activity" between the receivership entities and some of its affiliated brokers. That argument merely highlights the problem with this claim. The receiver provided the insurers with a list of all the viaticals within the scope of the receivership which pertained to the insurers' policies. The insurers obtained this list, which references 1700 policies, before they filed their Amended Ancillary Complaint. The insurers have the information regarding broker's commissions paid, not the receivership entities. Thus, we affirm the dismissal of this count of the complaint because the insurers have failed to make out a claim for an equitable accounting under Florida law.

Although the district court did not discuss its reasons for dismissing this particular claim, that is not an incurable defect. As we noted in *Grant v. Seminole County, Florida*, 817 F.2d 731, 732 (11th Cir. 1987), if a district court fails to discuss the reasons for dismissing a claim, that "does not necessarily preclude affirmance where appropriate reasons for dismissal are readily apparent."

**CONCLUSION**

The insurers' FVSA claims are properly dismissed because the FVSA does not govern transactions involving out-of-state viators. VFL, Reassure and AUL's

60

fraud-based claims are properly dismissed because of incontestability clauses in the original insurance contracts governing the Mullins, Johnson, and Buchner policies. Such clauses bar the insurers from challenging the validity of the contracts on the grounds of fraud after the policies have been in effect for two years during the lifetime of the insureds. Jefferson Pilot's fraud-based claims were properly dismissed because the claims failed to conform to the special pleading requirements under Rule 9(b) of the Federal Rules of Civil Procedure. The dismissal of the insurers' common law fraud, conspiracy and RICO claims is also affirmed on the alternative grounds set forth herein. The district court did not err in dismissing these claims.

Although the court dismissed one of the insurers' statutory fraud claims *sua sponte*, we nevertheless find that the Federal Rules of Civil Procedure warrant an affirmance. This claim simply fails to conform to the requirements of Rule 9(b) that allegations of fraud be pleaded with specificity. Additionally, we are satisfied that the court did not foreclose the plaintiffs' opportunity to address this deficiency by dismissing the claim *sua sponte*. The court granted the insurers leave to amend the original ancillary complaint and leave to file a second amended complaint. The insurers' chose a different path and brought this appeal. Finally, we find the district court properly dismissed the insurers' claim for modification of

the receivership order and that the insurers' claim for an accounting fails to make out a claim for equitable relief.

Thus, we **AFFIRM** the district court's order dismissing the insurers' Amended Ancillary Complaint.